**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 26, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

ROBERT GRADY JOHNSON,

  Petitioner-Appellant,

v.

MIKE MULLIN, Warden,

  Respondent-Appellee.

No. 06-6260

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**
**(D.C. No. CIV-04-1602-L**)

---

Michael J. Barta and Benjamin E. Kringer, Baker & Botts L.L.P., Washington, D.C., for Petitioner-Appellant.

Keeley L. Harris, Assistant Attorney General, State of Oklahoma (W. A. Drew Edmondson, Attorney General, with her on the briefs), Oklahoma City, Oklahoma, for Respondent-Appellee.

---

Before **KELLY, BALDOCK,** and **BRISCOE**, Circuit Judges.

---

**BRISCOE**, Circuit Judge.

---

  Petitioner Robert Grady Johnson, an Oklahoma state prisoner convicted of

murdering four people during the course of a bank robbery and sentenced to consecutive

terms of life imprisonment without parole, appeals from the district court's denial of his 28 U.S.C. § 2254 petition for federal habeas relief. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

## I.

### *Factual background*

On the afternoon of December 14, 1984, a robbery occurred at the First Bank of Chattanooga in Geronimo, Oklahoma. During the course of the robbery, three bank employees were forced into a back room and stabbed to death. Five bank customers, including a married couple and their infant daughter, entered the bank during the robbery and were forced into the same back room. There, they were ordered to lie face down on the floor and all, except for the infant, were shot in the back of the head. One of the customers died from the gunshot wounds.

Three days later, Johnson and Jay Wesley Neill, who shared an apartment in Lawton, Oklahoma, were arrested in a hotel in San Francisco, California, in connection with the bank robbery and murders. At the time of their arrest, Johnson and Neill were found to be in possession of numerous marked bills taken from the bank during the robbery. Law enforcement authorities also discovered that Johnson and Neill had used other marked bills to pay for hotel rooms, limousine rides, and shopping excursions in San Francisco.

### *Procedural background*

Johnson and Neill were charged in the District Court of Comanche County

(Oklahoma) with four counts of first degree murder, three counts of shooting with intent to kill, and one count of attempted shooting with intent to kill. The two men were originally tried together and convicted of all the crimes as charged. In accordance with the jury's recommendation, the trial court sentenced both men to death on each of the first degree murder charges, and twenty years' imprisonment on each of the remaining charges. On direct appeal, the OCCA reversed the convictions and sentences and remanded the cases for new trials, concluding that Johnson and Neill were improperly tried together because their defenses were mutually antagonistic, i.e., each defendant asserted the other was solely responsible for commission of the offenses. Neill v. State, 827 P.2d 884, 887-88 (Okla. Crim. App. 1992).

Johnson was separately retried in 1993 and convicted of the same eight crimes. He was sentenced to four life sentences without parole on the murder counts, three twenty-year sentences on the shooting with intent to kill counts, and a ten-year sentence on the attempted shooting count, with all sentences to be served consecutively. The trial court entered judgment on July 28, 1993.

Johnson thereafter began what would ultimately prove to be a long and tortuous attempt to obtain a direct appeal of his convictions and sentences. See Johnson v. Champion, 288 F.3d 1215, 1218-23, 1230 (10th Cir. 2002) (recounting Johnson's efforts to obtain appellate review of his convictions and sentences by the OCCA and directing federal district court to grant a writ of habeas corpus ordering Johnson's release unless state authorities afforded him a direct appeal out of time). The OCCA eventually granted

3

Johnson an appeal out of time and, on December 2, 2003, affirmed his convictions and sentences in an unpublished opinion. Johnson v. State, No. F-2002-918 (Okla. Crim. App. Dec. 2, 2003) (this opinion will hereinafter be referred to as the "OCCA Op.").

On November 23, 2004, Johnson filed a petition for writ of habeas corpus in federal district court. On March 29, 2006, the magistrate judge assigned to the case issued a lengthy report and recommendation recommending that Johnson's petition be denied. On June 28, 2006, the district court adopted the report and recommendation and denied Johnson's petition. Johnson filed a timely notice of appeal, which the district court construed as an application for certificate of appealability (COA) and denied. On January 18, 2007, this court granted Johnson a certificate of appealability with respect to eight general issues.

## II.

### *Standard of review*

Because Johnson filed his federal habeas petition well after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), AEDPA's provisions apply to this appeal. See McLuckie v. Abbott, 337 F.3d 1193, 1197 (10th Cir. 2003). "Under AEDPA, the appropriate standard of review depends on whether a claim was decided on the merits in state court." Id. "If the claim was not heard on the merits by the state courts, and the federal district court made its own determination in the first instance, we review the district court's conclusions of law de novo and its findings of fact, if any, for clear error." Id. (internal quotations omitted). If, however, the claim was

4

adjudicated on the merits by the state courts, the petitioner will be entitled to federal habeas relief only if he can establish that the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," id., § 2254(d)(2). "When reviewing a state court's application of federal law, we are precluded from issuing the writ simply because we conclude in our independent judgment that the state court applied the law erroneously or incorrectly." McLuckie, 337 F.3d at 1197. "Rather, we must be convinced that the application was also objectively unreasonable." Id. "This standard does not require our abject deference, . . . but nonetheless prohibits us from substituting our own judgment for that of the state court." Snow v. Sirmons, 474 F.3d 693, 696 (10th Cir. 2007) (internal quotation marks omitted).

*Propriety of Johnson's murder convictions*

In his direct appeal, Johnson asserted a two-fold attack on the propriety of his murder convictions, arguing that he was not present at the scene of the crime and thus could not be convicted as a principal, and that, even if he could be found to have aided and abetted Neill, Oklahoma's "aider and abettor rule c[ould not] be aggregated with the felony-murder rule to allow a conviction for felony murder when [he] was not present during the commission of the underlying felony." OCCA Op. at 9. The OCCA rejected both of these arguments on the merits. Johnson now renews those arguments in these

5

federal habeas proceedings.

*A) Sufficiency of evidence – Johnson's involvement as a principal in the felony murders*

Johnson first contends that the OCCA's rejection of his insufficiency of evidence argument was contrary to or an unreasonable application of clearly established federal law. The controlling standard for insufficient evidence claims asserted by state habeas petitioners was established by the Supreme Court in <u>Jackson v. Virginia</u>, 443 U.S. 307 (1979). Therein, the Supreme Court noted "that a state prisoner who alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt has stated a federal constitutional claim." <u>Id.</u> at 321. The standard applicable to such a claim, the Court indicated, is as follows:

> [T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. But this inquiry does not require a court to "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." (citation omitted). Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (citation omitted).

<u>Id.</u> at 318-19.

The OCCA, in affirming Johnson's convictions on direct appeal, did not cite to the Supreme Court's decision in <u>Jackson</u>. The OCCA did, however, effectively acknowledge the <u>Jackson</u> standard in reviewing Johnson's sufficiency of the evidence challenge, noting

6

that the question at issue was whether, "review[ing] the evidence in the light most favorable to the State, . . . a rational trier of fact could have found [Johnson] guilty of first degree felony murder." OCCA Op. at 3. In resolving that question, the OCCA began, as it indicated it would, by reviewing the evidence presented at trial in the light most favorable to the State:

> The State's evidence showed that in mid-November 1984, co-defendant Neill, with [Johnson] standing next to him, told a friend they were going to rob the Bank because it did not have any security cameras or guards.
>
> Prior to December 1984, [Johnson] told several friends of the severe financial problems he and Neill were experiencing. The week before the crimes, [Johnson] appeared to his neighbors to be nervous and upset. On Sunday December 9, [Johnson] and Neill purchased over $900.00 worth of clothes and jewelry. The next night, [Johnson] and Neill went to dinner at a local restaurant. Neill again mentioned robbing the Bank as a way to solve their financial problems.
>
> On Wednesday, two days before the robbery/homicides were committed, Neill visited a local pawnshop and inquired about the purchase of a gun. He indicated to the clerk that he needed the gun for protection as he had received threatening phone calls. Different types of guns were described to him and he was told that he must have a gun permit from the police department in order to purchase a gun. However, at nineteen years old, Neill was too young to apply for the permit.
>
> The next morning, Neill talked with a travel agent at the Lawton Municipal Airport. He originally wanted a flight to Nassau leaving after 6:00 p.m. Friday, December 14th. When told there was not a flight available, he requested one to San Francisco leaving after 5:00 p.m. that Friday. Neill also inquired into hotel accommodations, specifically executive suites and limousine services. When asked for payment, Neill said he would pay cash on Friday.
>
> That same morning, the twenty-one year old [Johnson] applied for a gun permit at the Lawton Police Department. He volunteered that he lived alone and needed the gun for protection. He was told he would have to wait

7

twenty-four hours before he could pick up the permit.

At approximately 1:15 p.m. that afternoon, [Johnson] and Neill walked into the Bank. They stayed only a few minutes, talking only with each other and looking around the Bank. Approximately 45 minutes later, [Johnson] and Neill purchased two hunting knives at a local discount store. They initially looked at purchasing a gun, but when informed the guns in that store were not real, they both looked at the selection of knives. After discussion among themselves, they selected two knives, each with a six-inch blade. Neill wrote a check for the knives from the checking account he shared with [Johnson]. Both Neill and [Johnson] provided identification for the check.

On the day of the robbery/homicides, Friday, December 14, 1984, at approximately 10:00 a.m., [Johnson] and Neill returned to the pawnshop and asked for a revolver seen on a previous visit. Neill asked what type of ammunition was needed for the gun, and [Johnson] asked where they could purchase that type of ammunition. Both men were shown how to load and fire the gun, and both men held the gun. They told the clerk they were to get the gun permit by 2:30 p.m. that afternoon and would be back then to purchase the gun.

At approximately 11:30 a.m., December 14, [Johnson] returned to the police department and picked up the gun permit. At approximately 12:25 p.m., both men returned to the pawnshop to purchase the gun. They hurriedly filled out the appropriate forms. Instead of listing his apartment as his address, [Johnson] wrote down a false post office box number. [Johnson] started to write the check to pay for the gun, but Neill insisted on filling out the check. The gun was handed to [Johnson] and he and Neill left the store.

[Johnson] and Neill then went to a local discount store to purchase ammunition. While Neill was asking about ammunition, [Johnson] went to find masking tape to purchase. Once again, Neill was too young to purchase the ammunition, so he waited for [Johnson]'s return. Within 30 minutes of purchasing the ammunition and leaving the store, [Johnson] and Neill returned to the store to exchange the shells. The gun they had purchased had been mistakenly marked as a .38 caliber when it was actually a .32 caliber. So, the .38 caliber shells purchased had to be exchanged for .32 caliber shells.

8

At approximately 12:45 p.m., [Johnson] went to a neighbor's apartment to use the telephone. He rescheduled the travel plans for an earlier flight, leaving at approximately 2:30 p.m. that afternoon.

Shortly after 1:00 p.m., [Johnson] and Neill entered the Bank. Bank employees Kay Bruno, Jerry Bowles and Joyce Mullenix were herded to a back room, forced to lie face down on the floor and stabbed to death. At the front of the Bank, Bellen Robles had entered in order to deposit a check. Finding the teller windows empty, she looked down the hallway to the back room. There she saw the back of a man as he bent over something. She went outside to tell her waiting husband, R[uben], that she thought the Bank was being robbed. He doubted this, and went inside the Bank with his wife and their fourteen (14) month old daughter. Entering the Bank just behind them was local farmer, Ralph Zeller. Barely inside the front door, they were greeted with a gun pointed at them and told to go to the back room if they wanted to live. Once in the back room they were directed to lie down on the floor.

The Robles and Mr. Zell[er] were left in the back room while Neill went up to the front of the Bank to sack up the money. While he was doing so, another customer, Marilyn Roach, entered the Bank. Neill pointed the gun at her and forced her to the back room. She was barely able to lie down inside the small, now crowded room. Moments later the gunshots rang out. Ms. Roach was shot twice in the head[, as was Mr. Zeller, who died from his injuries]. Bellen and Ruben Robles were each shot once in the head. Turning his head to keep the blood out of his eyes, Ruben Robles saw the gun pointed at his baby daughter and heard it click. But no shots were fired; the gun was empty.

One of the first people in the bank after the robbery/homicides was Calvin Bowles. As Bowles checked the status of the bodies lying on the floor, R[uben] Robles rose up and said they had been shot in the head. His wife, Bellen, then rose up and said to her husband, "I told you they were robbing the bank." Paul Franklin, who was also one of the first people on the scene after the shootings, testified to helping emergency medical personnel carry out Marilyn Roach. Mr. Franklin testified Ms. Roach asked, "Are they gone?"

Marilyn Roach later told investigators that after the shooting stopped, she heard two distinct voices in the bank. One voice, which sounded, "upset" said, "I told you not to shoot anybody." The other voice, which

9

sounded "casual," responded, "well, they moved."

At approximately 2:00 p.m. that day, Dara Pope arrived at her apartment across the hall from the apartment shared by [Johnson] and Neill. She knocked on [Johnson]'s door but no one responded.

[Johnson] and Neill arrived at the Lawton Airport at approximately 2:30 p.m. They paid one thousand two hundred dollars ($1,200.00) in cash for their tickets and boarded the plane; carrying only a tote bag. After arriving in San Francisco, [Johnson] and Neill embarked on a spending spree, traveling by limousine to various clubs and stores. They were arrested in their San Francisco hotel, Monday, December 17, 1984.

That same day, [Johnson] was interviewed by Federal Bureau of Investigation (FBI) Agent Dave Knowlton. In response to the agent's questions, [Johnson] said Neill had told him on December 13 of his plan to rob the Bank, and that Neill asked [Johnson]'s help in obtaining a gun. [Johnson] said he did help Neill acquire the gun and that after the robbery, he threw the gun in a pond. [Johnson] also told Agent Knowlton that Neill had a hunting knife with him when he left the apartment to go to the Bank.

Sometime after December 14, 1984, the apartment shared by [Johnson] and Neill was cleaned by the apartment complex's maintenance man. The scabbards belonging to the knives [Johnson] and Neill had purchased were found hidden behind sheetrock up close to the ceiling in the hall closet where the furnace was located.

Id. at 3-8. The OCCA then concluded that "[t]his evidence showed [Johnson] fully participated in the planning and execution of the robbery/homicides." Id. at 8. "Although," the OCCA noted, "[Johnson] was not identified by any witnesses as being inside the Bank with Neill, his conduct leading up to the robbery/homicides, and his conduct after the crimes, creates a reasonable inference that his was the other voice heard by Marilyn Roach inside the bank." Id. at 8-9. Thus, the OCCA concluded, the "evidence [wa]s sufficient to find [Johnson] guilty as a principal to felony-murder." Id. at

10

9.

Johnson contends the OCCA's conclusion represents an unreasonable application of the Jackson standard because, in his view, no rational jury could have found that he was present at the bank and actively participating in the robbery. In support of this general contention, Johnson offers four specific arguments:

> 1) "[t]hree competent adults with a full view of the bank all saw only one robber, positively identified as [co-defendant] Jay Wesley Neill," Aplt. Supp. Br. at 19;

> 2) "[d]espite a full forensic processing, no physical evidence even suggests that Mr. Johnson was at the crime scene," id.;

> 3) "the alibi evidence, even [viewed] in the light most favorable to the State, left no time for Mr. Johnson to have been at the bank, unless he had access to a car that was already gone and traveled 16 miles in, at most, 17 minutes," id.; and

> 4) "[e]ven the FBI agents investigating the case concluded that Mr. Neill committed the robbery by himself," id. at 19-20.

Johnson's first two arguments are historically accurate. None of the three surviving victims of the bank robbery (Bellen Robles, Ruben Robles, and Marilyn Roach) visually observed a second robber. Further, no physical evidence, such as fingerprints, hair samples, or clothing fibers, found at the crime scene positively implicated Johnson as having been present during the robbery. That, however, is not the end of the story. Marilyn Roach, one of the surviving victims, clearly and unequivocally testified that, after she and three other bank customers (the Robles and Ralph Zeller) were shot, she heard a voice say, "I thought I told you not to shoot anybody," and a second, distinct

11

voice respond, "[W]ell they moved." App. at 1834; id. at 1843 ("The tone and the voices were different."). Consistent with having heard two voices, Roach asked at the time of her rescue from the bank, "[A]re *they* gone?" Id. at 1835 (emphasis added). In addition to Roach's testimony, the evidence strongly suggests, as the State argued during the first stage proceedings, that the murders of the three bank employees could not have been committed in the manner that they were unless both Neill and Johnson were present at the bank. Immediately following the crime, the three bank employees (Kay Bruno, Joyce Mullenix, and Jerri Bowles) were found dead in a back room, laying on their stomachs, touching or nearly touching each other. Id. at 1791. Richard Boatsman, the medical examiner for Comanche County, Oklahoma, who performed the autopsies on the three bank employees, testified that each victim suffered multiple stab wounds (Bruno suffered thirty-four stab wounds, Mullenix suffered twenty-seven stab wounds, and Bowles suffered fourteen stab wounds), including large, gaping, "back and forth sawing type of incisional wound[s]" to their necks, id. at 2214, each of which would have taken considerable work and effort, id. at 2203. Despite the quantity and severity of these wounds, Boatsman found no defensive wounds on any of the three victims, except for perhaps one defensive wound on the finger of Ms. Bowles. As the prosecutor emphasized during first-stage closing arguments, it is unlikely that one perpetrator could have physically controlled all three women in a manner that would have allowed him to carry out the relatively lengthy attacks without any of the women attempting to fight back or flee. Id. at 2954 ("Can you alone keep those people there long enough for you to kill

12

them with the knife?  You cannot do it.  They're not gonna hold still while you're knifing them.  Somebody's gonna get up and run.  Somebody's gonna fight you.").  In other words, as the prosecutor argued, the more likely scenario is that both Neill and Johnson were present at the scene, and one of them performed the actual killings while the other controlled the victims by use of a gun or otherwise.  Id. at 2955 ("I'll tell you why nobody fought.  While they was being stabbed someone else had a gun to their head.  What's your choices?  Either fight this knife or be shot.").  Finally, the State presented evidence of a jailhouse confession that Johnson made while confined in the Comanche County Jail in August 1988.  According to witness Herman Williams, Johnson told Williams that he (Johnson) and Neill "planned it [the bank robbery] together and that they planned it in a way in which there would be no survivors."  Id. at 2134.  Williams further testified that Johnson told him "that the situation inside the bank got so gross until he [Johnson] had to leave" the bank and go sit in their automobile that was parked near the bank.  Id.  In light of all this evidence, we conclude that a jury could reasonably have found that Johnson was present at the bank during the robbery and murders.

Turning to Johnson's third argument, he suggests that his "alibi evidence" would have prevented a jury from reasonably finding that he was present at the bank during the robbery and murders.  The "alibi evidence" that Johnson refers to is primarily his own testimony that on the day of the robbery and murders, he remained at his own apartment while Neill, allegedly unbeknownst to Johnson, carried out the crimes.  In particular, Johnson testified that he visited a neighbor's (Debbie Ward's) apartment to use her

13

telephone shortly before 1:00 p.m. that day, did not leave Ward's apartment until 2 or 3 minutes after 1:00 p.m., and did not see Neill until shortly before 2 p.m. when he (Neill) returned to the apartment. In an attempt to bolster his testimony, Johnson elicited testimony from Debbie Ward that when she left her apartment that day to return to work, she did not observe Neill's car (the only vehicle owned by Neill and Johnson) in the apartment complex parking lot. Johnson also presented evidence suggesting that it would have taken a person, at an absolute minimum, more than seventeen minutes to drive from his apartment complex to the bank. In light of this evidence, Johnson asserted, it would have been impossible for him to have been at the bank at the time the crimes were committed.

What Johnson fails to note, however, is that his "alibi evidence" was far from uncontroverted. To begin with, the evidence overwhelmingly established that Johnson and Neill were together in the hours prior to the robbery, first picking up a gun permit from the Lawton Police Department (which Johnson had applied for the day before), then visiting a pawn shop at approximately 12:20 p.m. to purchase a handgun, and finally making back-to-back visits to a local department store to purchase ammunition for the handgun (during their first visit to the store, Neill and Johnson purchased the wrong ammunition and thus had to return shortly thereafter to exchange it). Testimony from Johnson's neighbor, Debbie Ward, suggests that Johnson and Neill returned to their apartment following their purchase of the gun and ammunition (presumably, the jury could reasonably infer, to prepare themselves for the robbery and finalize preparations for

14

their post-robbery trip). Specifically, Ward testified that she came home for lunch on the day of the robbery, and that at approximately 12:45 p.m., Johnson came to her door and asked to use her telephone. According to Ward, she overheard Johnson on the telephone saying he needed to change his flight schedule. Ward further testified that Johnson completed his telephone call and the two left her apartment shortly before 1 p.m., she to return to work and Johnson presumably to return to his own apartment. Although Ward testified under cross-examination by defense counsel that she did not observe Neill's car in the apartment parking lot when she left that afternoon, she acknowledged on redirect that during the preliminary hearing in 1985, she testified that she "did not particularly notice" if Neill's car was there or not. Id. at 1921. Brent Howard, Ward's boyfriend at the time of the crime, testified that he was also at Ward's apartment during the noon hour on the day of the robbery. Similar to Ward, Howard testified that Johnson came to Ward's apartment and proceeded to make a telephone call in which he asked to move his reservations up to as close to 2:30 p.m. as he could get them. Howard also testified that he and Ward left her apartment at approximately 12:50 p.m., and that he proceeded to drive her back to work for a 1:00 p.m. appointment. In addition to the testimony of Ward and Howard, the State presented evidence indicating that it took approximately twenty minutes to drive at the established speed limits from Johnson's apartment complex to the bank, but that it was possible, if exceeding the speed limits, to complete the trip in as little as ten to twelve minutes. The State also presented evidence indicating that a telephone call occurred between Kay Bruno, the branch manager, and the Glendale Savings & Loan

15

Association in Tampa, Florida, and that the call ended at approximately 1:16 p.m. on the day of the robbery. Finally, the State presented evidence that Dara Pope, who shared an apartment with Debbie Ward, knocked on the door of Johnson's apartment at 2 p.m., and again at 2:30 p.m., and that on neither occasion did anyone answer. Considering all of this evidence together, we conclude a rational jury could reasonably have found that, notwithstanding Johnson's "alibi evidence," it was not only possible for him to have been at the Bank at the time of the robbery and murders, but that he was present and actively participating. More specifically, the jury could reasonably have found that Johnson left Ward's apartment shortly before 1 p.m., and that he and Neill proceeded soon thereafter to the Bank, arriving at some point between approximately 1:10 and 1:15 p.m.

In his final argument in support of his insufficiency claim, Johnson asserts that "[e]ven the FBI agents investigating the case concluded that Mr. Neill committed the robbery by himself." Aplt. Supp. Br. at 19-20. Presumably, Johnson is referring to two reports from Federal Bureau of Investigation agent Granville Long, one dated April 15, 1985, and the other one undated. App. at 3279-81. In the April 15th report, Long gives a narrative of the offense, stating, in pertinent part: "At approximately 1:15 p.m. on Friday, December 14, 1984, an individual, subsequently identified as JAY WESLEY NEILL, entered the FIRST BANK OF CHATTANOOGA, Geronimo Branch, Geronimo, Oklahoma, *apparently alone*, to commit a robbery." Id. at 3279 (emphasis added). In the undated report, Long states that, "[o]n the basis of [his] investigation," "it seems apparent . . . that JAY WESLEY NEILL entered the bank and perpetrated the murders and robbery

16

by himself although he was assisted in the planning, preparation, and purchase of the instruments utilized in the crime by JOHNSON." Id. at 3281.

The problem for Johnson is three-fold. First, there is no indication in the record on appeal that these reports were admitted into evidence at trial. Second, even assuming they were admitted, they amount to nothing more than one person's opinion as to the probable chain of events. Lastly, at the time Long prepared these two reports, he did not have access to all of the evidence that was ultimately presented by the State at trial (for example, Long clearly would not have had access to the testimony of Herman Williams, who described the jailhouse confession of Johnson in August 1988). Thus, the conclusions tentatively reached by Long in his two reports do nothing to undercut the conclusion, outlined above, that the evidence presented by the State was sufficient for a rational jury to reasonably find that Johnson was present at the Bank during, and actively participating in, the robbery and murders.

In summary, we conclude that the OCCA reasonably applied the Jackson standard in rejecting Johnson's argument that the evidence presented at trial was insufficient to allow the jury to find him guilty as a principal in the felony murders. Thus, Johnson is not entitled to federal habeas relief on this claim.

*B) OCCA's application of felony murder doctrine*

In affirming Johnson's murder convictions on direct appeal, the OCCA also concluded that, "[a]ssuming arguendo, the evidence showed [Johnson] was not in the Bank with Neill at the time of the robbery/homicides, evidence of [his] participation in

17

the planning and his active involvement in the steps necessary to ensure completion of the plan [wa]s sufficient to find him guilty as a principal to felony-murder." OCCA Op. at 12. In particular, the OCCA noted that it "ha[d] specifically applied the aider and abettor rule to felony-murder cases," id. at 10, and that doing so "[wa]s consistent with the [Oklahoma] Legislature's definition of felony-murder" because it "'[wa]s a reflection of the policy that one who, by his willful criminal conduct, sets in motion a chain of events so perilous to the sanctity of human life that death results therefrom must bear the ultimate responsibility for his actions.'" Id. at 11 (quoting Hatch v. State, 662 P.2d 1377, 1384 (Okla. Crim. App. 1983)). In turn, the OCCA noted that Johnson's "participation in acquiring the gun permit and the weapons, 'casing' the Bank the day before the crimes, rescheduling travel arrangements to leave town immediately after the crimes, and taking the stolen money to and spending it in San Francisco [wa]s clear evidence that [Johnson] aided and abetted Neill in the commission of the robbery/homicides . . . ." Id. at 13. Because, the OCCA concluded, "[Johnson] and Neill together created a situation inherently dangerous to human life," Johnson "[could not] disclaim responsibility for his acts," and was thus liable "as a principal for felony-murder." Id.

In these federal habeas proceedings, Johnson attempts to challenge the OCCA's conclusion that, even assuming he only aided and abetted Neill, he was still subject to conviction for felony-murder. Johnson offers six arguments in support of this challenge. First, he contends that "the jury expressly rejected the theory that [he] aided [and] abetted

18

the murders."[1]  Aplt. Supp. Br. at 23.  Second, he argues that Oklahoma's "aider/abettor statute cannot be aggregated with [Oklahoma's] felony murder statute to broaden the scope of the felony murder statute."  Id.  Third, he argues that "the Oklahoma legislature itself recognized that the felony murder statute was not broadened by the aiders/abettors statute."  Id. at 24.  Fourth, he contends that "the aider/abettor statute only means that a defendant who aids and abets in a crime is guilty as a principal of that crime, not of felony murder."  Id. at 25.  Fifth, he argues that "even if the aider and abettor statute could be combined with the felony murder statute, a person is not guilty as an aider and abettor simply because they helped someone acquire a gun before a robbery."  Id. at 25-26.  Sixth, and finally, he argues that "the OCCA's decision to retroactively define the scope of the felony murder statute implicates not only state-law questions, but also violates [his due process] rights under the constitution."  Id. at 27.

The problem with Johnson's first five arguments is that they all focus exclusively on the proper interpretation of Oklahoma state law.  As the Supreme Court emphasized in Estelle v. McGuire, 502 U.S. 62 (1991), "it is not the province of a federal habeas court to reexamine state court determinations on state-law questions."  Id. at 67-68.  Rather, the Court stated, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  Id.

---

[1] It is unclear what Johnson is basing this assertion on.  Nothing in the record on appeal indicates that the jury found that he did not aid and abet Neill.  Moreover, a review of the trial transcript indicates that the State's evidence overwhelmingly established that he actively participated in the planning and execution of the robbery, regardless of whether or not he was actually present at the bank at the time of the robbery.

19

at 68.

Thus, that leaves only Johnson's sixth and final argument, i.e., that the OCCA's application of both the aider and abettor and the felony-murder doctrines to his case violated his federal due process rights. The initial problem with this argument is that there is no indication in the record on appeal that Johnson ever presented this argument to the OCCA.[2] As a result, it appears the claim is unexhausted and, ultimately, procedurally barred, since it is too late for Johnson to file an application for state post-conviction relief raising the claim. See Anderson v. Sirmons, 476 F.3d 1131, 1139 n.7 (10th Cir. 2007) ("Anticipatory procedural bar occurs when the federal courts apply procedural bar to an unexhausted claim that would be procedurally barred under state law if the petitioner returned to state court to exhaust it.") (internal quotation marks omitted).

Even assuming, for purposes of argument, that Johnson properly exhausted his due process claim, we conclude there is no merit to it. Although Johnson argues that the OCCA's decision in his case represents "the first time in Oklahoma history" that the OCCA held "that a defendant can be convicted of felony murder without proof that he was actively engaged in the commission of the underlying felony," Aplt. Supp. Br. at 27, he is mistaken. As the OCCA noted in affirming Johnson's murder convictions on direct appeal, it previously applied the aider and abettor rule in the felony-murder context in the case of Lewis v. State, 451 P.2d 399 (Okla. Crim. App. 1967). In Lewis, the defendant

---

[2] Johnson's appendix does not include the direct appeal briefs he filed with the OCCA.

and two co-defendants planned the robbery of a gas station, but in carrying out that plan the defendant merely drove "the get-away car and did not enter the premises nor participate in the assault made upon [the gas station operator] who was robbed, shot and beaten by" the two co-defendants. Id. at 400. The defendant was convicted of murder and sentenced to death. In disposing of the defendant's direct appeal, the OCCA concluded "that the evidence amply support[ed] the defendant's conviction for the crime of Murder as a principal under the felony murder rule . . . ."[3] Id. Thus, the Lewis case clearly placed Johnson on notice that he could be held liable as a principal for felony-murder, even if he "merely" aided and abetted Neill in the commission of the bank robbery.

Even ignoring the Lewis decision, we note, as the State has pointed out in response to Johnson's habeas petition and appeal, that in 1984 this court, in the context of a federal habeas proceeding initiated by an Oklahoma state prisoner, held that a first degree murder conviction under Oklahoma law could be upheld by application of "the aider and abettor statute, together with the Oklahoma felony murder statute . . . ." Chaney v. Brown, 730 F.2d 1334, 1350 (10th Cir. 1984). In reaching this holding, this court effectively rejected

_____

[3] Apparently, the victim in Lewis, after being robbed, shot and beaten, was forced into the get-away car, where he was shot several additional times, and then his body was disposed of. Tilford v. State, 437 P.2d 261, 264 (Okla. Crim. App. 1968) (affirming conviction of Lewis's co-defendant). Although it could be argued that these facts distinguish Lewis from the instant case (i.e., that the defendant in Lewis actively participated in the get-away and thus was present when the additional shots were fired at the victim), the important point is that the felony-murder charge arose out of the commission of the robbery, and not out of any potential kidnapping or other charge.

the construction of Oklahoma's then-existing felony-murder statute that is now urged by Johnson in these proceedings.

Finally, it is important to emphasize that Johnson's attack on the OCCA's dual application of the aider and abettor and felony-murder rules hinges, in substantial part, on his assertion that all he did in assisting Neill was to "acquire [the] gun before [the] robbery." Aplt. Supp. Br. at 26. A review of the state trial transcript, however, overwhelmingly establishes that Johnson played a far greater role in the planning and execution of the robbery. Even assuming, for purposes of argument, that Johnson was not present at the bank during the actual robbery, it is clear that he helped Neill purchase the gun and knives used during the crime, helped Neill "scout" out the bank on the day prior to the robbery, actively participated in making and executing the getaway plans, and assisted Neill in spending the robbery proceeds.

In sum, we conclude that Johnson is not entitled to federal habeas relief arising out of the OCCA's dual application of the aider and abettor and felony-murder rules under Oklahoma state law.

*Denial of right to fair trial*

Johnson contends that the separate and cumulative effect of trial court errors and prosecutorial misconduct deprived him of a fair trial and due process of law. As discussed below, however, there is no merit to any of the individual claims asserted by Johnson. Moreover, we note that there is no indication in the record on appeal that Johnson asserted any type of cumulative error argument on direct appeal, and thus his

22

current references to the "cumulative effect" of the trial court errors and prosecutorial

misconduct are unexhausted and, in turn, subject to anticipatory procedural bar.

*A) Trial court's instructions - felony murder*

Johnson first contends the trial court gave incomplete and misleading instructions

on the crime of felony murder.  More specifically, Johnson contends the jury in his case

"should have been instructed that [he] could not be convicted of felony murder if [they]

found . . . that he was not present and participating in the Geronimo Bank robbery."  Aplt.

Supp. Br. at 30.  Johnson raised this claim in his direct appeal, and the OCCA rejected it,

stating as follows:

> In his second assignment of error, [Johnson] contends the trial court
> erred in failing to instruct the jury that in order to find him guilty of first
> degree felony-murder, the jury must initially find he was present when the
> deaths occurred.

> The determination of which instructions shall be given to the jury is a
> matter within the discretion of the trial court.  (citation omitted).  Absent an
> abuse of that discretion, this Court will not interfere with the trial court's
> judgment if the instructions as a whole, accurately state the applicable law.
> (citation omitted).

> As discussed above, this Court has upheld convictions for felony-murder
> where the defendant was not present at the time of death.  (citations
> omitted).  Therefore, [Johnson]'s requested instruction was properly refused
> by the trial court as it was not an accurate statement of the law.

> A review of the instructions given to the jury in the present case shows a
> proper and accurate statement of the law.  The jury was instructed on the
> elements of felony-murder and the elements of the underlying offense of
> robbery with a dangerous weapon.  (citation omitted).  The jury was also
> instructed that the State must prove each element of the charged offense
> beyond a reasonable doubt.  (citations omitted).  The instructions in this
> case clearly stated that in order for [Johnson] to be found guilty of first
> degree felony-murder, the State must prove beyond a reasonable doubt that

23

[Johnson]'s conduct caused the death of the persons killed. These instructions adequately set forth the applicable law. Finding no error, this assignment of error is denied.

OCCA Op. at 14-15.

For the reasons noted above, we conclude that the OCCA's resolution of this issue was neither contrary to, nor an unreasonable application of, clearly established federal law.

*B) Trial court's ruling regarding cross-examination of Debbie Ward*

Johnson contends the trial court violated his right to a fair trial when it refused to allow defense counsel to refresh prosecution witness Debbie Ward's recollection with her prior sworn testimony from the trial of co-defendant Neill. Johnson first raised this issue on direct appeal. The OCCA rejected it on the merits:

> In his fifth assignment of error, [Johnson] contends the trial court erred in denying defense counsel the opportunity to refresh Debbie Ward's recollection of her testimony given in Neill's re-trial. The record shows that during cross-examination, the following occurred:
>> Q. (defense counsel) Ms. Ward, you've testified in this case in the past, have you not?
>> A. Yes.
>> Q. Do you recall that you testified in the retrial of Jay Wesley Neill?
>> A. Yes.
>> * * *
>> Q. And do you recall that Mr. Schulte asked you this referring to the afternoon of Friday, December 14, 1984. "What time did you leave to go back to work, as best you can recall?" Do you recall that he asked you that?
>> A. Yes.
>> Q. Do you recall that you responded I probably left the apartment about two or three minutes after 1:00 o'clock. Do you recall that you said that?
>> A. No, I don't recall saying that.

24

Q. You don't recall that you said that?
A. No, I don't.
Q. Okay. Would it refresh your recollection if I showed you the transcript?
A. Sure.
Q. Okay.

Mr. Barta (defense counsel): Your Honor, may I approach?

Mr. Schulte (prosecutor): Your Honor, it's improper. He just quoted from the transcript and she said she didn't recall.

The Court: Sustained.

(Tr. Vol. V., pgs. 1434-35).

Pursuant to 12 O.S. 1981, § 2613(B), defense counsel should have been permitted to refresh the witnesses' [sic] recollection with the transcript of her previous testimony. In Rogers v. State, 721 P.2d 805, 808 (Okl.Cr.1986) this Court stated:

> Title 12 O.S. 1981, § 2613(B) clearly governs this issue: Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate them thereon.
>
> This rule requires counsel, normally the cross-examiner, to first ask the witness about the prior inconsistency, and then given [sic] the witness the opportunity to deny, affirm, or explain the earlier statement. Also imposed upon counsel is the duty of identifying the subject matter of the statement, the time and place of its utterance, and the person to whom it was made.
> 721 P.2d at 807-808. See also Neal v. State, 837 P.2d 919, 921 (Okl.Cr.1992).

Here, Ms. Ward did not recall her previous testimony and responded that her recollection would be refreshed if she could see the transcript of her testimony. While the record is not clear, it appears defense counsel had a copy of the transcript in his possession and was prepared to show it to the witness.

25

[Johnson] asserts this error warrants reversing his conviction as the time he left Ms. Ward's apartment "was a key fact in establishing that he could not have been at the bank at the time Jay Neill committed the crimes." A good deal of [Johnson]'s defense at trial was spent trying to show that he could not have physically traveled the distance between his apartment and the Bank within the estimated time frame of the robbery/homicides. However, on appeal, we have found [Johnson] can legally be held criminally liable for the robbery/homicides even if he had not been in the Bank at the actual time of the robbery/homicides. Therefore, [Johnson] has failed to show any prejudice as a result of the trial court's ruling. (citation omitted). Accordingly, the error was harmless and this assignment of error is denied.

OCCA Op. at 19-21.

The question we now face is whether the OCCA's resolution of Johnson's claim was contrary to, or an unreasonable application of, clearly established federal law. The "clearly established federal law" applicable to this claim is the Supreme Court's decision in Chambers v. Mississippi, 410 U.S. 284 (1973). Therein, the Court held that "[t]he right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations." Id. at 294. More specifically, the Court held an accused has, at a minimum, "a right to examine the witnesses against him" and "to offer testimony" in his defense. Id. "In order to establish a violation of his due process right to present evidence, a defendant must show that the evidence excluded by the trial court's ruling might have affected the trial's outcome; in other words, he must show that the evidence, if admitted, would have created reasonable doubt that did not exist without the evidence." Patton v. Mullin, 425 F.3d 788, 797 (10th Cir. 2005) (citing United States v. Valenzuela-Bernal, 458 U.S. 858, 868 (1982)).

We are not persuaded that the OCCA's decision was contrary to, or an

26

unreasonable application of, these principles. As the OCCA explained, the evidence presented by the State at trial overwhelmingly established that Johnson aided and abetted Neill in carrying out the robbery and homicides. Thus, regardless of whether or not Johnson was present at the Bank during the robbery, he was, as already discussed, responsible for the robbery and homicides under a combination of Oklahoma's aiding and abetting statute and its felony murder statute. In other words, because of the application of these two rules, it is beyond dispute that, had the trial court allowed defense counsel to refresh Debra Ward's testimony, it would not have altered the outcome of trial.

Even reviewing the issue de novo and ignoring application of the aiding and abetting statute, we conclude the trial court's error did not affect the outcome of the trial. As noted, Debra Ward's boyfriend, Brent Howard, testified as part of the State's case-in-chief that he and Ward left her apartment at approximately 12:50 p.m. on the day of the robbery (or at least sometime before 1 p.m.), and that he drove Ward back to her place of business for a 1:00 p.m. appointment. In light of Howard's testimony, the jury could reasonably have found that Johnson likewise left Ward's apartment at approximately 12:50, and that he and Neill then proceeded soon thereafter to drive to the Bank. In other words, even if defense counsel had been allowed to refresh Ward's testimony, the jury could still reasonably have concluded that Howard's time estimate was more accurate than Ward's (or that the actual time was somewhere between the two estimates), that Ward and Johnson actually left Ward's apartment before 1:00 p.m. that day, and that Johnson in turn was able to drive to the Bank with Neill and participate in the commission

27

of the robbery and murders.

*C) Admission into evidence of second bloody knife*

Johnson contends the trial court violated his right to a fair trial by admitting into evidence what he refers to as the "second bloody knife," i.e., a knife that was recovered from the floor of the bank following the crime and that was determined to have the blood of a victim on the handle but not the blade. Johnson contends, as he did at trial, that the "second bloody knife" was used by the medical examiner during the autopsy of one of the victims and thus was contaminated with that victim's blood. Johnson raised this issue on direct appeal, and it was rejected on the merits by the OCCA:

> [Johnson] argues in his twelfth assignment of error that the introduction of a second, bloody knife denied him a fair trial, as the State did not establish a sufficient chain of custody.

> "The purpose of the chain of custody rule is to guard against substitution of or tampering with the evidence between the time it is found and the time it is analyzed." (citation omitted). While it is the State's responsibility to show the evidence offered is in substantially the same condition at the time of offering as when the crime was committed, it is not necessary that all possibility of alteration be negated. (citation omitted). If there is only speculation that tampering or alteration occurred, it is proper to admit evidence and let what doubt there may be go to its weight rather than render the evidence completely inadmissible. (citation omitted).

> Arnold Bentz [an OSBI chemist] testified he found a knife at the scene of the murders that had some blood on the handle but none on its blade. Bentz stated he placed the knife in a sealed envelope and initialed the envelope. The sealed envelope was taken to the Lawton regional laboratory and later transferred to the FBI in Washington D.C., for testing. On cross-examination, defense counsel tried to establish that before the envelope was transferred to the FBI it had been unsealed. Bentz testified that the envelope was sealed when it was sent to the FBI and he had no knowledge of what happened to it after its transfer.

28

Agent William Eubanks, FBI, testified he received a package containing a knife, which was identified as having been found at the Bank. Agent Eubanks said he tested the knife for the presence of human blood. Eubanks had no other recollection concerning the container the knife[] arrived in.

When the prosecutor attempted to admit the knife, marked as State's Exhibit 12, into evidence, the defense objected. The prosecutor admitted he had been "lax" on the chain of custody, but he understood there was an agreement that the chain of custody of the physical evidence would not be an issue. The prosecutor admitted the original containers holding the evidence ha[d] been discarded long ago, but he had presented testimony from the FBI agents, which handled the evidence, and which he believed sufficiently established the trial [sic] the evidence followed.

In a bench conference, defense counsel argued that the evidence would show that before the envelope containing the knife was sent to the FBI, the envelope was unsealed, the knife taken out and used at the autopsy of Kay Bruno where it was inserted into one of her wounds. Defense counsel argued that evidence raised serious questions as to the integrity of the testing of the knife and any blood on the knife was relevant on the issue of whether the knife was actually used in the murders or simply fell out of a pocket. The trial court overruled the defense objections and admitted into evidence State's Exhibit 12.

Subsequently, OSBI Agent Richard Goss testified he and Bentz were present at the autopsies. Agent Goss testified the Medical Examiner, Dr. Boat[s]man, had a question about the knife that was found at the scene. Goss said Bentz retrieved the knife he had collected from the Bank, removed it from its envelope, and held it up. Goss said Dr. Boat[s]man, who was standing across the room, looked at the knife and Bentz placed the knife back in its envelope and removed it from the room. Goss said neither he nor Dr. Boat[s]man handled the knife, that only Bentz handled it.

Dr. Boat[s]man acknowledged he had testified a number of times in this case. The prosecutor went over a transcript where there was some indication that a knife or something similar to a knife had been inserted into a wound during an autopsy. Dr. Boat[s]man said he recalled the passage but said the prosecutor's description was not an accurate interpretation. Dr. Boat[s]man testified it was a metal probe that had been inserted into the wounds. He said that was standard procedure in an autopsy and was used to determine the direction and depth of the wound. Dr. Boat[s]man said that never in his long career, having done approximately 100 autopsies, had he

29

ever inserted a knife into a victim.

> On cross-examination, defense counsel reviewed with Dr. Boat[s]man his previous testimony where he indicated a knife had been placed into a wound. Dr. Boat[s]man admitted his response had been poorly worded and it did sound as if a knife had been inserted. He explained that it had not been a knife but a metal probe that had been used during the autopsy.

> Here, the State's evidence showed the knife was substantially in the same condition at the time of offering as when it was found in the Bank. At best, the record offers only speculation that the knife might have been tampered with prior to its examination by the FBI. Therefore, the trial court properly admitted the evidence with any doubts going to the weight to be given the evidence by the jury. Accordingly, this assignment of error is denied.

OCCA Op. at 33-36.

In determining whether the OCCA's resolution of this issue was contrary to, or an unreasonable application of, clearly established federal law, the threshold determination that must be made is identifying what, if any, "clearly established federal law" applies to the issue. In his opening appellate brief, Johnson cites to only one Supreme Court decision, Miller v. Pate, 386 U.S. 1 (1967). Aplt. Supp. Br. at 39. Miller, however, held only "that the Fourteenth Amendment cannot tolerate a state criminal conviction obtained by the knowing use of false evidence."[4] Because there is simply no indication in the record on appeal that the prosecution in Johnson's case knowingly used false evidence (let alone that there was any false evidence at all), Miller is inapplicable. That, in turn, leaves, at most, only the general due process right to a fair trial that has been identified by

---

[4] In Miller, the state prosecutor deliberately misrepresented at trial that a pair of men's undershorts were stained with blood from the victim of a brutal sex attack, when in fact the undershorts were stained with paint. 386 U.S. at 6-7.

the Supreme Court in other contexts. E.g. Medina v. California, 505 U.S. 437, 449 (1992) (referring to due process right to a fair trial in the context of a defendant's competency to stand trial); but see Anderson v. Mullin, 327 F.3d 1148, 1153 (10th Cir. 2003) (noting that "our inquiry is tightly constrained by the AEDPA's requirement that there be clearly established federal law on point").

After reviewing the record on appeal, we conclude that the OCCA's decision was neither contrary to, nor an unreasonable application of, the general due process right to a fair trial. Dr. Boatsman, the medical examiner who performed the autopsies on all four victims, testified on direct examination by the prosecution that he recalled testifying several times previously in Johnson's case and acknowledged that his prior testimony on one of those occasions "could be interpreted" as indicating that he put a knife in a wound of one of the victims. App. at 2228. However, Dr. Boatsman characterized his prior testimony as "poorly worded," id. at 2229, and testified that he had not, in fact, inserted a knife in a victim's wound. Id. at 2228. Dr. Boatsman explained that, in accordance with "standard procedure," he had inserted "a metal probe," i.e., "a glorified piece of stiff wire that has no cutting surfaces," in order "to determine [the] direction and depth of wounds . . . ." Id. at 2229. Further, Dr. Boatsman unequivocally denied ever inserting a knife in a victim's wound during any autopsy performed in his career. Id. On cross-examination, Dr. Boatsman reiterated that it was "standard procedure in investigating gunshot wounds or knife wounds to probe them with something," but he denied using a knife to do so, and instead again testified that he had in fact utilized a stiff wire "probe." Id. at 2233. In light

31

of Dr. Boatsman's unequivocal testimony, it was entirely reasonable for the OCCA to have concluded that the trial court's admission of the second knife did not violate Johnson's due process right to a fair trial.

*D) Admission of statements made by Johnson to Paul Dunn*

Johnson contends the trial court violated his right to a fair trial by admitting into evidence statements that he made in various post-arrest letters to an individual named Paul Dunn. According to Johnson, these statements "were inflammatory, prejudicial, and not even arguably probative of any legitimate issue in the case." App. Supp. Br. at 41. Johnson raised this issue on direct appeal. The OCCA rejected the issue on the merits:

> [Johnson] argues in his ninth assignment of error that he was denied a fair trial by the admission of his statements in letters to Paul Dunn. Mr. Dunn had contacted [Johnson] in prison and told him he wanted to write a book about [Johnson] and Neill's story. [Johnson] now complains the prosecutor repeatedly questioned him regarding his statements to Dunn in which [Johnson] indicated he thought he could make money by turning the story of the Geronimo Bank robbery into a book or movie. [Johnson] also complains the prosecutor improperly questioned him concerning statements he made insulting Oklahomans, statements made wherein he used profanity and statements regarding his sexual orientation. [Johnson] asserts the prosecutor's questioning had no bearing on his guilt or innocence and was completely irrelevant and inflammatory so that any possible probative value was outweighed by unfair prejudice.

> [Johnson]'s defense was that he did not participate in the robbery/homicides and was unaware of Neill's plans to rob the Bank. [Johnson] also testified that he had a "horrible" childhood, that he was abused by his stepfather, and that he watched his stepfather abuse his mother, which resulted in his passive nature.

> To rebut that defense, the prosecutor introduced statements [Johnson] had made in his letters to Mr. Dunn. In these letters, [Johnson] attempted to elicit money for his accounting of the robbery/homicides. [Johnson] said in part, "I know I have a good story and I know it will make a great

32

book/movie. I'm just waiting for a reasonable financial opportunity. I feel it's only fair. I'm eager and ready." Defense counsel's objections on the grounds of relevance were overruled. [Johnson] admitted to signing a contract with Dunn with any money he would receive going to his mother.

[Johnson] also admitted to writing to Mr. Dunn that he enjoyed growing up, and loved school. No objection was raised by defense counsel. [Johnson] wrote in another letter of his experiences with school counselors in regards to people calling him names, but never in regards to problems with his stepfather. In one letter, [Johnson] even stated, "I would complain to the counselors just to make them aware how immature these dumb Oklahoma hicks were." Again, the prosecutor's inquiry was not met with an objection.

While certain of the above prosecutorial inquiries [Johnson] now challenges were met with timely objections at trial, others were not. Reviewing the challenged comments for reversible error, plain or timely preserved, we find the comments did not deny [Johnson] a fair trial. As a general rule, any matter is a proper subject of cross-examination which is responsive to testimony given on direct examination or which is material or relevant thereto and which tends to elucidate, modify, explain, contradict or rebut testimony given in chief by the witness. (citation omitted). It has long been a rule of the Court that when a defendant opens up a field of inquiry on direct examination, he may not complain of subsequent cross-examination. (citation omitted). The extent of cross-examination rests in the discretion of the trial court and reversal is only warranted where there is an abuse of discretion resulting in prejudice to the defendant. (citation omitted).

The prosecutor's inquiry into [Johnson]'s letters to Paul Dunn was not beyond the scope of direct examination in this case. While the letters themselves were not raised on direct examination, their content directly rebutted [Johnson]'s claims of innocence and ignorance. The letters also rebutted his pleas for sympathy based upon an unfortunate childhood. Accordingly, we find the trial court did not abuse its discretion in allowing the inquiries into [Johnson]'s letters to Paul Dunn. This assignment of error is denied.

OCCA Op. at 28-30.

The OCCA's resolution of this claim was neither contrary to, nor an unreasonable

33

application of, clearly established federal law.  As with his previous claim of error

concerning the admission of the second knife, Johnson has failed to identify a Supreme

Court case precisely on point.[5]  Thus, the "clearly established federal law" applicable to

this claim is, at best, simply the general due process right to a fair trial.  In turn, a review

of the trial transcript substantiates, as indicated by the OCCA, that Johnson testified in his

own defense that he (a) suffered a "horrible" childhood, App. at 2357, in large part due to

verbal and physical abuse from his stepfather, (b) suffered similar abuse at the hands of

Neill, (c) was in fact scared of Neill, particularly after the robbery and murders, (d) was

completely ignorant, and thus innocent, of the planning and commission of the robbery

and murders, and (e) that numerous prosecution witnesses who testified contrary to him

had lied.  In light of Johnson's testimony, we agree with the OCCA that the contents of

Johnson's letters to Dunn were relevant for purposes of rebutting Johnson's testimony

and challenging his credibility in general.[6]  Accordingly, the OCCA's decision affirming

the trial court's admission of this evidence was neither contrary to, nor an unreasonable

application of, the general due process right to a fair trial that has been identified by the

---

[5] The only Supreme Court case cited by Johnson in support of this claim, Old Chief v. United States, 519 U.S. 172 (1997), is inapposite.  Old Chief, which involved a federal prosecution, discussed only the admission of evidence under the Federal Rules of Evidence, and did not make any pronouncements regarding the interplay of the admission of evidence and the due process right to a fair trial.

[6] Under cross-examination by the prosecutor regarding his letters to Dunn, Johnson acknowledged (a) telling Dunn that he knew he "ha[d] a good story" that would "make a great book/movie," App. at 2441, (b) entering into a contract with Dunn, id. at 2443, (c) trying to frighten Dunn via letter, id. at 2453-54, and (d) telling Dunn that he "enjoyed growing up," id. at 2454.

34

Supreme Court.

*E) Prosecutor's comments regarding Johnson's sexual orientation*

Johnson complains that the prosecutor made repeated, gratuitous, and prejudicial comments regarding Johnson's sexual orientation. In particular, Johnson complains that the prosecutor:

> • indicated in his first-stage opening statement that Johnson accompanied Neill to a "gay area" of San Francisco;
>
> • asked a witness about Johnson and Neill visiting "gay bars" in San Francisco; and
>
> • asked Johnson, during cross-examination, if he knew that the hotel he originally booked in San Francisco was a "noted gay hotel."

Johnson also complains that the prosecutor at times questioned witnesses about Johnson's sexual orientation. According to Johnson, the prosecutor's references "preyed on the public's fear, distrust, and dislike of an especially disfavored group" in order "[t]o obtain a conviction . . . ." Aplt. Supp. Br. at 44.

Johnson first raised this issue on direct appeal. The OCCA rejected it on the merits:

> In his seventh assignment of error, [Johnson] complains he was denied a fair trial by the prosecutor's comments on his sexual orientation. * * *
>
> * * *
>
> [Johnson] asserts he was improperly questioned by the prosecutor on cross-examination concerning his relationship with Neill. The record shows the prosecutor was well within the scope of cross-examination as [Johnson] specifically testified to his relationship with Neill. [Johnson] admitted that he was in a homosexual relationship with Neill. [Johnson] portrayed Neill as the dominant member of the relationship and himself as the passive

35

member.  [Johnson]'s defense to his participation in any aspect of the crimes was that he was under Neill's domination and acted as he did because of his relationship with Neill.  This Court has repeatedly held that prosecutorial remarks are not grounds for reversal where they are invited, provoked or occasioned by defense counsel  (citations omitted).  Here, the prosecutor's comments were invited by [Johnson]'s direct examination.

[Johnson] further argues the prosecutor repeatedly made comments regarding his homosexual activities that had nothing to do with his relationship with Neill, and were clearly irrelevant and prejudicial.  Specifically, he refers to comments and questioning by the prosecutor that while in San Francisco, [Johnson] visited "gay areas" and "gay bars" and that he and Neill stayed in a "gay hotel."

Certain information concerning [Johnson]'s activities in San Francisco were relevant in showing [Johnson]'s conduct leading up to his arrest and apprehension.  (citation omitted).  To use [Johnson]'s description, any "gratuitous" comments, or comments which improperly emphasized [Johnson]'s homosexuality is not cause for reversal.  Allegations of prosecutorial misconduct should not cause a reversal of judgment or modification of sentence unless their cumulative effect is such as to deprive the defendant of a fair trial and fair sentencing proceeding.  (citation omitted).  In considering whether the prosecutor's comments rendered the trial fundamentally unfair, we review the comments in context, considering the evidence and whether the remarks can be said to have influenced the verdict against [Johnson].  (citation omitted).  Here, we are not persuaded that any improper remarks seriously affected the fairness of the trial.  Although [Johnson] disputed much of the State's evidence, the evidence of guilt was substantial.  Considering also the jury instructions given in this case, we find the prosecutor's comments did not improperly influence the jury's consideration of the evidence.  (footnote omitted).  Accordingly, [Johnson] was not denied a fair trial by the prosecutor's comments on his sexual orientation.

OCCA Op. at 24-26.

The controlling standard for this claim, under the AEDPA standard of review, was set forth by the Supreme Court in Darden v. Wainwright, 477 U.S. 168 (1986).  "The relevant question," the Supreme Court held in Darden, "is whether the prosecutors'

36

comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Id. at 181 (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)).

After examining the entire trial transcript, we conclude that the OCCA's decision was neither contrary to, nor an unreasonable application of, Darden. To begin with, it is important to note that the defense made no attempt to hide, and indeed expressly acknowledged the homosexual relationship between Johnson and Neill. For example, during the first-stage opening arguments, defense counsel stated:

> The evidence will show that at that time Jay Wesley Neill and Robby Johnson were involved in an intimate relationship. They lived together. They were homosexuals. Whatever your feelings are about that, ladies and gentlemen, and I know a lot of us have a hard time understanding it, but that's what the evidence in this case will show and you have promised not to judge my client for his relationship with Jay Neill but only for the crimes with which he has been charged.

App. at 1499. Consistent with this opening statement, Johnson testified in his own defense that he had been a "practicing homosexual" all of his life, id. at 2352, that his life essentially "centered around" his sexual orientation, id., and that he met Neill at "a gay bar . . . in Lawton." Id. at 2358. Moreover, it is clear from the record that Johnson attempted to bolster his "complete innocence" defense by eliciting evidence regarding his own passive and effeminate characteristics, as well as evidence that he was allegedly dominated, and at times abused, by Neill. For example, during the cross-examination of Rhonda Neff, a woman who lived with Johnson and Neill during the fall of 1984, defense counsel was able to elicit testimony that Johnson was very passive and friendly, and that

37

Neill dominated and was verbally abusive towards Johnson. Likewise, Johnson himself testified that he was abused by his stepfather because he was a "sissy," id. at 2353, that Neill was the dominant person in their relationship, id. at 2366, and that he was in fact frightened by Neill when Neill returned from the bank following the crime. Id. at 2404. Finally, in the first-stage closing arguments, defense counsel again acknowledged Johnson's "homosexual lifestyle with Jay Neill," id. at 2879, and argued that Johnson was a "passive, shy effeminate person who was not capable of going in the Geronimo Bank and engaging in the carvings . . . ." Id. at 2926. In light of these defense tactics, we agree with the OCCA that the prosecutor's relatively limited references to Johnson's homosexuality in no way rendered Johnson's trial unfair or a violation of due process.

*F) Prosecutor's introduction of testimony from Herman Williams*

Johnson contends that the prosecutor violated his due process right to a fair trial by introducing the testimony of Herman Williams, who, as previously noted, testified that, while both he and Johnson were confined in the Comanche County Jail in August 1988, Johnson admitted to him that he was present at the Bank during the robbery and murders. Johnson characterizes Williams as a "serial perjurer who was looking to curry favor with anyone who would support his attempts to obtain parole . . . ." Aplt. Supp. Br. at 49-50. Johnson further argues that "Williams' testimony was incredible on its face." Id. at 50. In sum, Johnson argues that the prosecutor knowingly introduced false evidence.

Johnson asserted this same claim on direct appeal. The OCCA rejected it on the merits:

38

In his thirteenth assignment of error, [Johnson] asserts he was denied a fair trial by the prosecution's knowing use of false evidence in the form of testimony by jailhouse snitch Herman Williams. [Johnson] relies on *Omalza v. State*, 911 P.2d 286, 307 (Okl.Cr.1995) to argue the knowing use of false or misleading evidence important to the prosecution's case in chief violates the Due Process Clause of the Fourteenth Amendment. In *Omalza* we stated, "[t]o prove the claim on appeal the appellant bears the burden to establish (1) certain testimony was misleading, (2) the prosecution knowingly used the testimony and (3) the testimony was material to guilt or innocence. *Id.*

In response to a defense objection concerning William's [sic] testimony, an in-camera hearing was held to determine the admissibility of the testimony. In that hearing it was established that Williams was then incarcerated at Joseph Harp Correctional Center and had been so for approximately the past five years. Williams said he was serving a life sentence for possession of cocaine with intent to distribute. He admitted to pleading guilty to "three assaults and battery with a dangerous weapon" for which he received three ten year sentences to run concurrently with his life sentence. He also admitted to having been convicted of and serving time for intimidation of a State's witness, "subordination" of perjury, and conspiracy to commit perjury. Williams testified that [Johnson] approached him while in jail and told him he was involved in the Geronimo Bank robbery and murders.

Williams also testified that [Johnson]'s trial was the second time he had provided information to law enforcement since he had received his life sentence, and that previously he had provided information on several occasions in drug cases. Williams said he was aware the District Attorney had made a request on his behalf to the Pardon and Parole Board for leniency. He said he did not expect to receive any further requests for leniency from the State and was testifying because of a religious experience he had experienced since being incarcerated. Williams admitted he had waited four years before he told the authorities about his conversation with [Johnson].

At the conclusion of his examination of Williams, defense counsel renewed his objection to the testimony. After hearing argument from both sides, the trial court ruled the testimony admissible and its weight and credibility for the jury's determination.

[Johnson] has failed to show the State knowingly used false testimony.

39

> Merely because Williams' testimony was contradicted by [Johnson]'s testimony does not make it false. Further, if anything had been left out during the State's direct examination about Williams' criminal history or his decision to tell law enforcement about [Johnson]'s statements, it was certainly brought out by the defense on cross-examination. Cross-examination was very thorough and Williams' criminal history and reason for testifying was fully presented to the jury. Further, Williams' credibility to a certain extent was impeached on cross-examination. Having reviewed the record, we find [Johnson] has failed to demonstrate the State knowingly used false evidence. This assignment of error is denied.

OCCA Op. at 37-38.

The question we must decide is whether the OCCA's resolution of this issue was contrary to, or an unreasonable application of, clearly established federal law. In <u>Napue v. Illinois</u>, 360 U.S. 264 (1959), the Supreme Court reversed a conviction obtained through the use of false evidence that was known to be false by representatives of the State. "Since <u>Napue</u>," the Supreme Court "has adhered to the principle that a conviction obtained by the knowing use of false evidence is fundamentally unfair." <u>Evans v. Virginia</u>, 471 U.S. 1025, 1027-28 (1985).

After reviewing the record on appeal in this case, we conclude that the OCCA's decision was neither contrary to, nor an unreasonable application of, <u>Napue</u> and its progeny. Importantly, nothing in the record substantiates Johnson's assertion that Williams' testimony was false, let alone that the prosecution knew the testimony was false. Although Williams' credibility was certainly in question, given his past convictions and his admitted interest in obtaining parole, his testimony was not, as asserted by Johnson, "incredible on its face." To the contrary, Williams' testimony was entirely plausible. Moreover, as pointed out by the OCCA, the record establishes that Williams

40

was subjected to strenuous cross-examination by defense counsel, and the issue of Williams' credibility was ultimately, and properly, left for the jury to determine.

   *G) Prosecutor's introduction of "mathematically impossible" time trials*

Johnson contends that the prosecutor also knowingly introduced false testimony in the form of what Johnson refers to as "mathematically impossible time trials supposedly conducted by the FBI." Aplt. Supp. Br. at 51. In support of his contention, Johnson argues that FBI "Agent [Leroy] Foreman's testimony that he drove the route [from Johnson's apartment to the Bank], without speeding, in 18 minutes and 52 seconds is wrong as a matter of mathematic certainty," and "[t]he State was well aware of this." Id. Further, Johnson argues the defense provided the prosecution with an expert report prior to trial that indicated, "given the distances involved and the speed limits, an individual could not complete the route in the time claimed by the FBI without speeding," yet "[t]he State has not and cannot point to any errors in the [defense] expert's analysis." Id.

The threshold question we must address is what standard of review to apply to this issue. According to the parties, the issue was raised by Johnson in his direct appeal brief (although, as noted by respondent, the magistrate judge in this case concluded it "was presented as what appears to [have] be[en] an afterthought").[7] Notably, however, there is no mention of the issue in the OCCA's opinion disposing of Johnson's direct appeal. Thus, the issue could be considered (a) unexhausted (as the district court in this case did)

_____

   [7] We again note that Johnson's direct appeal brief is not included in the appendix he filed with this court.

41

and procedurally barred, (b) having been implicitly rejected on the merits by the OCCA and thus subject to the normal AEDPA standards of review, or (c) having been overlooked by the OCCA and thus subject to de novo review by this court. See Young v. Sirmons, 486 F.3d 655, 663 (10th Cir. 2007) ("If the state court did not decide a claim on the merits, and it is not otherwise procedurally barred, we review the district court's legal conclusions de novo"). Out of an abundance of caution, we will treat the issue as having been overlooked by the OCCA and review the issue de novo.

Foreman, an FBI agent, was involved in the investigation of the robbery and murders. As part of his investigation, he performed what the prosecution referred to "as time trials from the Tanglewood Apartments [where Johnson and Neill lived] to the Geronimo Bank." App. at 2025. More specifically, Foreman drove "several times" back and forth between the two locations. Id. According to Foreman, when he "deliberately went . . . the speed limit and obeyed all the traffic signs," "the fastest time" he was able to drive it was "eighteen minutes, fifty-two seconds, and the slowest time was about twenty-three minutes." Id. Foreman also testified that he could have driven the route faster had he not observed all traffic laws. Id. at 2026. On cross-examination, defense counsel questioned Foreman about the precise route he drove between the two locations, and Foreman reaffirmed the time results he had obtained.

Upon completion of the State's case-in-chief, Johnson presented several witnesses in his own defense, including Brad Davis, an assistant professor of mathematics at a local university. Davis opined, based solely on mathematics, that the fastest a person could

drive between the two locations while observing all traffic laws would be eighteen minutes and fifty-nine seconds. Although it is not clear from the record on appeal, the defense apparently provided the prosecution, prior to trial, with a report prepared by Davis outlining his conclusions.

Apparently, Johnson would have us characterize Foreman's testimony as false simply because it contradicted, ever so slightly, the conclusions reached by Davis. Johnson would also, apparently, have us find that the prosecution knew that Foreman's testimony was false simply because, after having received Davis's report, it proceeded to introduce Foreman's testimony during its case-in-chief. Johnson is clearly mistaken in both regards. The fact that Foreman was able to drive the route in a slightly faster time than estimated by Davis could be attributed to (a) Foreman failing to completely observe all traffic laws, (b) Davis having miscalculated the possible driving times, or (c) a combination of the two. Importantly, none of these possible circumstances necessarily render Foreman's testimony false. Nor could a court reasonably find, based on these circumstances, that the prosecution acted wrongly in proceeding to present Foreman's testimony at trial. Thus, there is clearly no merit to Johnson's assertions that his due process right to a fair trial was violated by the admission of Foreman's testimony.

*H) Prosecutor's introduction of testimony from Marilyn Roach*

Johnson contends the prosecutor knowingly introduced a third piece of allegedly false evidence, i.e., the testimony of surviving victim Marilyn Roach that she heard the voices of two robbers. Johnson claims Roach's testimony in this regard was "clearly

false" because "Roach admit[ted] that the alleged conversation between the two robbers took place after she had been shot twice in the head and lost consciousness." Aplt. Supp. Br. at 53. Johnson further notes that the two other surviving victims, Bellen and Ruben Robles, "were lying right beside Ms. Roach," but "did not lose consciousness" and later "told the FBI that they did not hear the conversation Roach claims to have heard, and that the only conversation in the bank at that time was a conversation between the two of them." Id. Thus, Johnson argues, "[t]he only reasonable inference is the conclusion reached by the FBI: The voices Ms. Roach believed she heard were in fact the voices of the other survivors." Id. In turn, Johnson argues that "[t]he prosecutor knew that Ms. Roach's testimony was not true" because the chief FBI investigator concluded at one point in a report that Roach's testimony was the product of a hallucination. Id.

Johnson asserted a similar claim on direct appeal. The OCCA rejected the claim on the merits:

> [Johnson] next argues he was denied a fair trial by the admission of Marilyn Roach's testimony. Ms. Roach was the only victim to testify she heard two different voices in the Bank at the time of the robbery. [Johnson] asserts her testimony was not trustworthy as it was based in part on her belief that God spoke to her and referred to the perpetrator of the crime in the plural form. Further, he contends the testimony is not trustworthy because Ms. Roach admitted she heard the conversation between the two robbers after she had been shot twice in the head and had lost consciousness. Citing to an FBI report included in the original record, but not introduced at trial, the FBI agent in charge of the investigation into the robbery/murders concluded Ms. Roach had been "hallucinating" when she thought she heard the conversation between two people in the bank. [Johnson] argues that under these circumstances, the trial court should not have allowed Ms. Roach to testify about her "hallucinations" which lacked even the most basic indicia of reliability.

44

[Johnson] fails to cite any legal authority to support his allegations. Absent plain error we will not address assertions unsupported by legal authority. (citation omitted).

Every person is competent to be a witness except as otherwise provided in the Oklahoma Evidence Code. (citation omitted). A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. (citation omitted). Evidence to prove personal knowledge may consist of the witness's own testimony. (citation omitted).

Marilyn Roach testified to matters of which she had personal knowledge. The weight and credibility of her testimony was exclusively for the jury's determination. (citation omitted). As we stated in *Martinez v. State*, 984 P.2d 813, 824 (Okl.Cr.1999), *cert. denied*, 529 U.S. 1102, 120 S.Ct. 1840, 146 L.Ed.2d 782 (2000):

> Determining the weight and credibility of witness testimony, therefore, has long been held to be the "part of every case [that] belongs to the jury, who are presumed to be fitted for it by their natural intelligence and their practical knowledge of men and the ways of men." *Scheffer*, 523 U.S. at —, 118 S.Ct. at 1266, quoting *Aetna Life Ins. Co. v. Ward*, 140 U.S. 76, 88, 11 S.Ct. 720, 724-25, 35 L.Ed. 371 (1891).

Accordingly, we find no plain error in the trial court's admission of Marilyn Roach's testimony. This assignment of error is denied.

OCCA Op. at 39-40.

The OCCA's analysis, though lacking any citations to Supreme Court precedent, is neither contrary to, nor an unreasonable application of, Napue and its progeny. On direct examination, Roach described entering the bank, encountering a robber (whose facial features she could not remember), and being forced at gun-point to walk to the back room of the bank. Roach in turn testified that, while laying face-down on the floor of the back room, she was shot twice in the back of the head and may have lost consciousness. After

45

the shooting stopped, Roach testified, she heard someone say, in an "upset" manner, "I thought I told you not to shoot anybody," and a second, distinct voice answer, "Well they moved." App. at 1834. On cross-examination by Johnson's counsel, Roach stated that "[t]he tone and the voices [she heard] were different." Id. at 1843. Roach further testified that, due to the brain damage she suffered initially following the gun shot wound and her recovery therefrom, she was able to remember the events more clearly at the time of trial than immediately following the crime. Id. at 1844-45. On redirect, Roach testified that every time she has been interviewed or questioned about the crime, she has provided the same information regarding the voices she heard. Id. at 1848. Roach's credibility was bolstered by the testimony of prosecution witness Charles Ingalls, an Oklahoma City-based neurosurgeon who treated Roach in the emergency room following the shooting. Ingalls testified that there was no damage to Roach's left ear or to any portion of her brain that would have affected the hearing in her left ear. Id. at 2244. Ingalls further testified that there was nothing in his examination of Roach that indicated she could not have heard or recalled voices in the bank following the shooting. Id. at 2245.

To be sure, Roach's credibility was subject to reasonable challenge. As noted, the voices she testified hearing occurred after she was shot twice in the back of the head and possibly lost consciousness. Further, neither of the other two surviving witnesses (i.e., the Robles) heard any other voices, and in fact the Robles testified that they briefly conversed with each other following the shooting. Finally, as noted by Johnson, FBI

46

agent Granville Long, the chief investigator on the case, prepared a report at some point

(the precise date of the report is unclear from the record, and the report was not presented

at trial) opining:

> It is believed highly probable that ROACH was hallucinating somewhat after her injury and that certain things she recalled as being said were, in fact, said in general but they are variations of things she overheard the ROBLES' [sic] saying to each other as they lay on the floor feigning death mixed in with statements made by witnesses who were arriving on the scene very shortly after the departure of the robber. The basic point to be observed is that ROACH, while having almost total view of the bank, saw only one individual in the bank. Also, all of the information which she provided which would indicate that two persons were in the bank is contradictory to that previously provided by the ROBLES' [sic] whose other information, for the most, has been corroborated.

Id. at 3281. Nevertheless, we agree with the OCCA that this evidence did not necessarily

render Roach's testimony false, and that the question of Roach's credibility was

ultimately for the jury to decide.[8]

> *I) Prosecutor's second-stage arguments*

In his final issue on appeal, Johnson contends that the prosecutor violated his due

process right to a fair sentencing proceeding when, during second-stage closing

arguments, he stated:

> Any time you have a death, four deaths, four additional people shot, of this magnitude, and the individuals **for what reason so that [they] can take the money, hit the gay bars, party and do cocaine** and go on a shopping spree in San Francisco. * * * **And I pray that you're strong enough** – there is only one verdict – to get up, go in that deliberation room, render your decision, make it unanimous. **Those of you that are strong on this**

---

[8] For essentially the same reasons, we conclude that Johnson has failed to establish any knowing misconduct on the part of the prosecution in presenting Roach's testimony.

**jury work on the weak**.  * * *  [Defense] [c]ounsel wants one of you that is not strong enough to assess the death penalty and if he is able to get that then he saves this man's life.  * * *  **I pray you, I beseech you stay strong**.  * * *  Make sure you check the aggravating circumstances that apply, hold your head up high, you follow the law.  **You were committed to your oath**.

App. at 3263-64 (emphasis added as suggested in Johnson's opening appellate brief).

"Taken together," Johnson asserts, these statements by the prosecutor "add up to an argument that was intentionally designed to prey upon the passions and prejudices of the jury to obtain a sentence on improper grounds."  Aplt. Supp. Br. at 58.  In other words, Johnson asserts, the prosecutor's "closing was profoundly unfair and corrupted the sentence."  Id.

Johnson challenged some, but not all, of these prosecutorial arguments on direct appeal to the OCCA.  The OCCA rejected the arguments actually raised by Johnson:

> In his seventeenth and final assignment of error, [Johnson] asserts he was denied a fair sentencing proceeding by comments of the prosecutor during second stage closing argument.  [Johnson] argues the prosecutor's repeated admonitions for the jurors to be strong and do their duty influenced their decision and resulted in a harsher sentence than he might have otherwise received.

> Initially, [Johnson] directs us to the following comment:

>> Bring your common sense to this case.  Any time you have a death, four deaths, four additional people shot, of this magnitude, and the individuals for what reason so that [they] can take the money, hit the gay bars, party and do cocaine and go on a shopping spree in San Francisco . . .  I pray that you're strong enough – there is only one verdict – to get up, go in that deliberation room, render your decision, make it unanimous.  Those of you that are strong on this jury work on the weak.

> (Tr. Vol. IX, pg. 2777).

48

Defense counsel objected only to the reference to the weak, and not any other part of the comment reprinted above. (Tr. Vol. IX, pg. 2778). Accordingly, [Johnson]'s complaints on appeal concerning 'yet another gratuitous reference to [his] homosexuality' have been waived for all but plain error. (citation omitted). A prosecutor has the right to discuss evidence during the second stage in arguing for an appropriate punishment. (citation omitted). The comment in the present case was based on the evidence. Therefore, we find no plain error.

Further, it is not error for the prosecutor to focus on the jury's duty to serve and render a verdict based upon the evidence or acknowledge to the jury the difficulty of their task and ask them seriously to consider the punishment options available. (citation omitted). The comments here are not equivalent to those in other cases that we have held to be improper and prejudicial as playing on societal alarm or as inflaming the passions or prejudices of the jury. (citation omitted). The comments focused on the duty of the jurors to serve and render a verdict based upon the evidence.

[Johnson] next argues the prosecutor improperly asked the jury to have sympathy for the victims and not to show any mercy or pity for the defendant. The citation to the record for this comment shows defense counsel's objection was to a part of the argument, which referred to what had been done by "jurors before you." No objection was made to the comments now challenged on appeal. Therefore, we review those comments only for plain error.

It is improper for the prosecution to ask jurors to have sympathy for victims. (citation omitted). However, the prosecution, as well as the defense, has the right to discuss fully from their standpoint the evidence, and the inferences and deductions arising therefrom. (citation omitted). The prosecutor's reference to the "horrible, horrible death" that four people in this case experienced was based on the evidence and not merely an appeal for sympathy.

Allegations of prosecutorial misconduct do not warrant reversal of a conviction unless the cumulative effect was such [as] to deprive the defendant of a fair trial. (citation omitted). Because we do not find that any comments deprived [Johnson] of a fair sentencing proceeding, this assignment of error is denied.

OCCA Op. at 47-49.

49

The "clearly established Federal law" applicable under AEDPA to this claim is the Supreme Court's decision in Darden v. Wainwright, 477 U.S. 168 (1986). In Darden, a state habeas petitioner sentenced to death argued that the prosecutors in his case made improper remarks during second-stage closing arguments that deprived him of his right to a fair trial. The Supreme Court held that "[t]he relevant question" in addressing such claims "is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Id. at 181 (quoting Donnelly, 416 U.S. at 643). Notably, the Supreme Court emphasized that "it is not enough," to establish a due process violation, "that the prosecutors' remarks were undesirable or even universally condemned." 477 U.S. at 181 (internal quotation remarks omitted). Similarly, this court, in applying the Darden standard, has held that "not every improper or unfair remark made by a prosecutor will amount to a federal constitutional deprivation." Tillman v. Cook, 215 F.3d 1116, 1129 (10th Cir. 2000).

After reviewing the record, we readily conclude that the OCCA's resolution of this claim was neither contrary to, nor an unreasonable application of, the standard outlined in Darden. To begin with, the prosecutor's reference to the post-crime behavior of Johnson and Neill (i.e., visiting gay bars, etc.), was nothing more than a comment on the evidence properly admitted at trial (and it is not entirely clear from the record that this precise claim was ever presented to the OCCA on direct appeal). Although the remaining statements made by the prosecutor, essentially asking the jury to remain "strong," were perhaps improper, they were not sufficiently egregious to render the second-stage

50

proceedings unfair. In this regard, it is important to note that the trial court instructed the jury that it was their responsibility to render a verdict based on the evidence, App. at 3286, and that "[n]o statement or argument of the attorneys [wa]s evidence." Id. at 3287; see Darden, 477 U.S. at 182 (noting, in concluding that prosecutors' improper comments did not result in a denial of due process, that "[t]he trial court instructed the jurors several times that their decision was to be made on the basis of the evidence alone, and that the arguments of counsel were not evidence."). Moreover, a review of the second-stage verdicts indicates that, notwithstanding the prosecutor's arguments, the jury was able to make nuanced determinations with respect to each count of conviction (for example, the jury found the existence of three aggravating factors with respect to the convictions pertaining to the murders of the three bank employees, but found the existence of only two aggravating factors with respect to the murder of a bank customer), and ultimately chose not to impose the death penalty on Johnson. In sum, we agree with the OCCA that the challenged prosecutorial comments did not render the second-stage proceedings fundamentally unfair.

The judgment of the district court is AFFIRMED.

51